Good morning, ladies and gentlemen. We are pleased this morning to have District Judge Griesbach of the Eastern District of Wisconsin sitting with us. Welcome. And of course, as you know, Circuit Judge Rovner is participating through the courtesy of the electromagnetic spectrum. So, our first case for argument this morning, I represent Kevin McCabe, the objector appellant. I'll start with the issue of claim preclusion. The district court erred in treating different incidents, that is, different telephone calls, as constituting a- Sir, Circuit, but even before you start, I really need to know the answer to this. Did Mr. McCabe receive a phone call during the class period or not? Yes, he did. During the class period? Yes, he did. And by stating on page one of the objections, which I think is page A115 of the record, he stated that he is a class member, which means by definition that he received at least one call during the class period. The district judge seemed to misunderstand what Mr. McCabe stated, which is A, I am a class member, hence I, by definition, received a call or more during the class period. And I also- What was the date of that telephone call? The one that came during the class period? Within the class period. I don't know the date, but it would have been- No, I would like to know. Okay, well, the class period is defined as from August 2011 through August of 2012. And by stating that he is a class member, he is stating by definition that he received a call in that period of time. Whether it was in September of 2011 or July of 2012 has no relevance. It was during the class period. What the district judge misunderstood is that Mr. McCabe also then stated that he received calls outside of the class period. I think it was just simply a misreading of what Mr. McCabe indisputably stated. He didn't need to give the dates. How would that have made any difference? He stated he's a class member, which means he received a call or more during the class period. The other parties agree, and Judge Canelli found, that the release only applies to claims based on phone calls made during the particular 2011-2012 class period. So why is there a need for a supplemental notice to the class? I mean, as far as I can tell, only Mr. McCabe thought that there was any real ambiguity on this point. Well, I beg to differ that Mr. McCabe would have been the only person who thought so. But let's talk about the settlement agreement, which being that it's obviously far more specific in terms of the released claims than the class notices, that controls the issue. So the settlement agreement contains this, and only this, definition of the term released claims. Any and all claims regarding the alleged calls, and it goes on from there, but the key term is the alleged calls. Thus the question is this. Do the alleged calls include calls that were alleged in the consolidated amended complaint, excuse me, consolidated complaint, which is docket number 102, that is calls that were made since May 24th of 2008, and I'll just refer to that for convenience as the first complaint. Did Mr. McCabe ever submit proof that he was called during the class period? No, and he was not required to do so. He was only, he would have been required to do so given that he was not in the defendant's records, only if he had decided to make a claim. But he did not make a claim. He objected, and the objection procedure specifically states that in order to object, you must submit your name and the telephone number on which you received calls during the class period, which he indisputably did. There's no, I don't think there's been any dispute. Let me explain why I seem to be confused, perhaps. One of us is. His affidavit that dates McCabe as a class member who received calls on his cell phone number and landline phone outside of the class period of August 2011 through August 2012. If only received calls outside of the class period, then he is not in fact a member of the class. That's not what it says, Judge. He stated that he is a class member, and he also received calls outside of the class period. Again, by stating that he is a class member, he is necessarily stating that he received at least one phone call during the class period. Yes, he also received calls outside of the class period. But again, his statement, he didn't need to give a date. By stating that he's a class member, he might as well have said that he's a class member. Another one of the problems is that this statement is not under oath. It was under oath, Judge. They were under oath? Yes. On the last page, I think it's page 15 of the objections, he specifically includes the certification that all the facts stated therein, which obviously include him being a class member and having received additional calls, were under oath. So you think he can be prosecuted for perjury if he's not in the class? If he knowingly lied? If he knowingly made false assertions? Yes. Is that attested in the way an affidavit is attested? I'm sorry? Is it attested? No, it wasn't notarized, but under 28 U.S.C. 1746, any time a federal document has to be submitted or may be submitted in affidavit form, it may also be submitted as a declaration or a certification. I don't remember which one he did, but it was one of those two. He certified, yes, to answer your question directly, the factual assertions, if he knowingly lied about any of them, yes, he could be, theoretically he could be prosecuted, absolutely. Those statements, his factual assertion that he's a class member was under oath, yes. Now again, turning to the issue, if I may, of claim preclusion, each, and this is what the district courts simply seem not to understand, each telephone call that violates the TCPA is a separate and distinct violation of the law. They cannot be lumped together. Now, the fact that each telephone call involves the same type of conduct and involves the same type of injury and even is alleged to violate the same type of statute does not add up to claim preclusion. And just by way of an example, okay, an exception, at least arguably, would be, as an example, somebody attacks somebody and throws five successive punches. Well, if each punch had occurred in isolation, that would give rise to a cause of action for battery. But five successive punches would combine to form one cause of action under the TCPA when it gives a private right of action per violation, not even per action like under the FDCPA, but per violation, per phone call. So each phone call, even if they occurred two minutes apart, which they did not, but let's just even say they did, two minutes apart, each phone call gives rise to a separate and distinct cause of action. Again, a violation of the TCPA is a statutory tort. It's not based on a contractual relationship. It's based on legislation where the conduct, the unsolicited phone call, would not be a violation of the law but for the legislation, but for the TCPA. The multiple, each phone call, again, provides for, or gives rise, I should say, to a separate cause of action. And we discussed the case of MAP, which is discussed quite a bit at length in the briefs, where the court recognized that two telephone calls, just, I think it was ten days apart, give rise to separate and independent causes of action. Another matter, and this would have to wait for discovery, is that by alleging that in addition to receiving the in-class period calls, Mr. McCabe received calls outside of the class period, only discovery would show whether any of those calls were also received after he brought his action in the case of res judicata, or claim preclusion, claim preclusion would not apply because it does not apply to subsequent actions. And this court stated that in Doe versus Allied Signal, it's a 1993 case of this court, that if I bring a lawsuit today, based on, let's say, a phone call I got some time ago, and I get another phone call, we're talking the TCPA, of course, I get another phone call in a week, in a month, what have you, there's no res judicata, obviously I couldn't have known about that phone call when I filed this case. So even if this court were to view, and I don't see how that makes any sense, but let's just say, this court were to say we lump in all the different, albeit separate and distinct violations of the TCPA to, as the district court stated, one, a single violation of the TCPA, which again makes no sense, but let's just suppose that were the finding of this court, well, obviously, a call that came after Mr. McKay began his eastern district court action would obviously not be subject to res judicata, and only discovery would show that, again, I don't think it is relevant because I don't think claim preclusion applies, not pre-clause, applies regardless. Thank you, Mr. Bank. That's it? Okay, I'll reserve for rebuttal. Thank you. Your time has expired. My time has expired. Okay, thank you. Mr. Clark. Good morning. I represent the appellant Freedom Home Care. We challenged two orders. First, the order awarding fees to class counsel, and second, the order denying our request for an incentive award in fees. Looking first to class counsel's fee award, the court appropriately cut fees using the sliding scale from the requested $18 to $24 Council, I have a question about the fee award. Why is there appellate jurisdiction over the fee award? There's appellate jurisdiction over the fee award because, well, first of all, this court has considered on multiple occasions appeals from objectors involving fee awards. Fee award is separate from the merits. That much is clear under the Supreme Court's precedent. What's also clear is that until we have a final number, it's premature. And my concern, if it wasn't clear before, is that the district judge has said that counsel gets at least $14.76 million, and maybe more, and I will consider later how much more. So it doesn't look like we have the final quantification of the award. How can you appeal from something where the judge has said, Person X gets at least Y, but maybe more, and I'll figure out later how much more? Well, I guess that my response would be that we know at a minimum the $14 million is a concrete... Yeah, but at a minimum is not a final quantification of anything. Do you have any cases supporting the proposition that you can appeal the first half of a fee award, or the first 80 percent, or anything like that, when the judge expressly says, I'm not done yet? I don't have any on the top of my head. I don't think off the top of my head. I've done some research. I don't think such a case is there. I'm just shocked that you have an appeal from an award that the district judge expressly declares is not final, and nobody points out that there is a problem with appellate jurisdiction. Okay. Did you make any attempt to discuss with the Defendant's Council the fact that you would be making objections, or what objections they would be making to the fee award before preparing your own? No, we did not. So, I'd be happy to address the Court's jurisdictional question in a subsequent briefing to the Court. If we think a subsequent brief is needed, we will let you know. Okay, thank you. You can go ahead and discuss the merits, because this is going to be your only crack. Okay. If we dismiss for lack of jurisdiction once the district judge is done, then we'll come back, perhaps even on the same briefs. Okay. We believe the Court appropriately cut fees using the sliding scale, but erred in its methodology by considering X post-negotiations between class counsel and defendant instead of an X anti-risk evaluation, and abused its discretion in applying a risk premium to each tier, which had never been done in this circuit. The result is $2 to $3 billion in excess of what should have been awarded, and should be returned. You know, you are seeking compensation for the equivalent of four weeks of full-time work by one attorney for your objections. Couldn't that be considered excessive, given that the defendants would be pursuing their own objections? Well, respectfully, Judge, our hours were far . . . Oh, that would start to . . . Our, I'm sorry, our time, our hourly rates were far below those of class counsel, 450 and 325, and we did not seek a multiplier. So, in our opinion, they're reasonable fees, and we also believe that we did play a part in the reduction of fees by $3 to $6 million. But I just wanted, if I can get back to the X anti-analysis, the Court's risk analysis essentially boils down to the fact that defendants waited until late in the litigation to make a significant offer, which is not X anti, and is not a legitimate basis for employing unprecedented risk premiums. The Court here extended risk premiums to each tier, which no court has done in this circuit. The remaining risks identified by the Court just don't separate this case from other TCPA litigation in a meaningful way. Well, X anti, you have no idea. You know there's risk, but you don't know the specifics. But here the judge, by noting the specific risk that in hindsight now he sees, isn't that a way of illustrating the contingent nature of the whole fee request? I think it is. However, in our view, it's necessarily X post. It's not an X anti analysis. So this circuit is still, according to Americana Arts, and essentially all authority out there, the appropriate frame of reference is an X anti perspective. And so you look at the perspective, you look at the class members and class counsel and say, what would they have agreed to from the outset? And not what, down the road, at this point, what would they have negotiated? At this point, what would they have negotiated? That's not consistent with the X anti market analysis. And even class counsel's own expert, Professor Rubenstein, took this approach. He said, he considered the result or the outcome, which is what the court did in Americana Art, but not the settlement negotiation history. Professor Rubenstein said, the point is not to look at counsel's risk X post, but rather to demonstrate the strength of the achievement compared to the risk X anti. And, in addition to the X post issue, the remaining market factors just don't justify the unprecedented recovery. The stakes of the case, 1 billion if you go off defendant's numbers, or 25 billion based on plaintiff's estimate of 50 million calls, and TCPA's statutory damages, by everyone's account, played a considerable role in achieving the settlement. And the quality and amount of work, which was four years with a $4.9 million load start, is not so exceptional as to support this unprecedented recovery. Craftwood lumber, for example, was on file for three years and five months before it ultimately settled, and no risk premium was applied. I see I have two minutes left. I'll reserve it for rebuttal. Certainly, counsel. Mr. O'Mara. Thank you, Your Honor. May it please the court. My name is Brian O'Mara, and it is my privilege to be here today representing the defendant appellants. Our request for the court is that today is to reverse the judgment entered on the attorney's fees to remand the case to the district court with instructions to delay entry of such an award until conclusion of the claims process and limit any risk premium to the first band of recovery. Counsel, do you have any comment on the jurisdictional issue? I do, Judge Easterbrook, and I agree with you. We argued primarily as a policy matter. This was premature. I agree you are correct. It is a jurisdictional issue. There are two questions here. One is whether the award was premature, and the other is whether the appeal is premature, and I'm concerned with the second question. I think that is a legitimate concern, Your Honor. I do believe that because Judge Cannelli of the district court found for the sliding scale and approved certain fees before, knowing exactly what the approval process would bear, that that was an abuse of discretion, and I agree that there is a jurisdictional issue here. If you would like me to proceed on the merits, Your Honor, I can do that as well. Is his formula final? As I understand it, notwithstanding the results of the motions practice, in this case there remain some serious liability questions that awaited resolution at trial. So why was it an error for Judge Cannelli to conclude that there were substantial risks remaining for the class and class counsel right up until the moment of settlement, such that the risk premium ought to extend beyond the first band? Understood, Judge Rovner. We understand that the district court weighed heavily the vicarious liability aspect. We think liability, be it direct liability or vicarious liability, is the biggest issue in any TCPA case. Damages are essentially a foregone conclusion, they're formulaic, you just have to do the math. Here, yes, I understand the district court put a lot of emphasis on the issue of vicarious liability. However, at the outset, three complaints that were filed within months of each other all recognized that vicarious liability was an issue. At that point in time there were a number of cases which determined that under the TCPA vicarious liability was a theory that could be pursued. There were several governmental entities, well two actually, that were identified in complaints. The Maine AG was warning about this calling campaign. The Washington AG was also warning about this issue, as it is in any case. And the fact that the district court put so much emphasis on the concept of vicarious liability, we do believe was an error and was an abuse of discretion. And moreover, the district court, I think, recognized this. Very early on in the case, in December, end of December 2012, when the district court denied a motion to accept of having A company hire B company and B company makes the phone calls, A company couldn't get off, as the district court said, scot-free. And also cited cases in which they found that vicarious liability was a viable theory and could be pursued. And I do want to get back to the point, you know, what drives settlements is this, the Telephone Consumer Protection Act and the damages provision in this act. It's a draconian statute in which it exposes companies to bankruptcy level exposure. And that is really what drives settlement. Liability is really, in every TCPA case, what the plaintiffs have to put all their work into. And therefore, we think it was an abuse of discretion for the district court to find that in this case, it deserved this add-on to every single band of recovery. And again, the plaintiffs... Counsel, I must say I don't even understand the argument. It's just arithmetically simple to load the risk premium into one band and eliminate it from the other bands. Why would the law require that to be done? You can come up with a fee award that is absolutely the same, even if you say the whole premium is in band one. And you can do that in two ways. You increase the premium in band one. You increase the width of band one. Or you can spread the premium over different bands. But the outcome, that is the total risk premium being awarded to counsel, is identical. So that's the source of my question. What sense would it make? What difference could it make to say that there's a rule of law that all the premium must be in band one? And I'll try to clarify, Your Honor. We are not saying that all the premium should be stuck in band one. What we are saying is that the district court should have limited its risk premium, which we don't quarrel with. We believe that they should have received risk premium, but it should be limited to band one and at 6%. And if I wasn't clear on that, I apologize. Then this has nothing to do with bands. You're just saying the risk premium should be lower. That is correct, Your Honor. Yes. All the discussion of bands is just a distraction. It's a red herring. And to be clear exactly, I apologize if I wasn't clear enough, but it's at 6%. We do not quarrel with. This was a hard-fought case. I lived many years of it, and it was a hard-fought case. And Plaintiff's counsel... And compared to other class action settlements that we see, this was a very, very good result for the class, wasn't it? I do not deny that. It was a good result, yes. But again, I do think that the district court said that the plaintiffs had to overcome certain obstacles, which I think the district court gave undue weight to, including, for example, the relatively low interest in the plaintiff's bar. I think the record belies that. If you look at Docket 88, the record volume 2, there was a hotly contested fight over who was going to be lead counsel. This was a case where there was no interest, like in the Silverman case. They said there was essentially no interest. That was a securities fraud case, but there was essentially no interest by the plaintiff's bar. You know, I have had a hard time understanding why you think it was inappropriate for Judge Roedner, I think, you know, if you look at the Redmond case, the Redmond, and that's what we rely on, the Redmond case says that you need to look at to determine whether or not a fee is reasonable, you need to look at what is paid to the class or what the class receives. It is true, Your Honor, we agreed to a floor and a ceiling. However, there was a $20 million sweet spot in between there. And we don't know where it will end up. And would it alter the district court's opinion? I don't know. And I guess that's the point. We just don't know what the ultimate recovery of the class will be. Hasn't he given a formula? Wait, why didn't you wait to find out? I mean, really? Why are you here? Why am I here? That's an excellent question, Judge Roedner, and we did ask... It's appellate time today, and I'm here. And I apologize for that, Your Honor. Well, your brief does not, the jurisdictional section of your brief, and you filed two, neither one of them observes that there is no appellate jurisdiction because we're premature. You are correct, Your Honor. We made more of it as a policy argument and why he should have waited. We did raise it with the district court. Obviously, the order entered, and so yes, we are here. Moving on to some of the other obstacles that were not present, I think, in this case that were present in other cases. Other cases, and this includes kind of those four cases, Garage, Capital One, and some of the other cases, Craftwood, they had obstacles that weren't present, such as the possibility of having the case dismissed based on an arbitration clause, and that was in the Garage case. In the Capital One case, which we think is very that could have completely blown up the case. There was no such obstacle in this case. There was no established business relationship that was available to the defendants. There was really no consent issues that was available to the defendants. There was no emergency purposes that was available to the defendants. These are all exceptions that in these other cases these defendants had. The only exception we could possibly use was the political exception, but that would only apply to landlines. There was still an awful lot of cell phone calls, which would, again, put this in a very high dollar amount judgment, which was, again, a huge basis for settling. And I would also like to point out the Silverman case, which Judge Easterbrook, you authored, obviously. It's a securities fraud case. Also, you know, it just doesn't matter who signs any opinion for the court. They speak for the court. Of course. Of course, which the court authored, correct? It's a securities fraud case, and in that case they allowed a 27.5% that was what they entered for the award. The award that the district court entered in this case was just about there, was at 27.3%. And if you look at Silverman in that case, the court found that 27.5% may be at the outer limits of reasonableness, and they couldn't consider the sliding scale approach because it wasn't raised at the district court. And so here we have a TCPA case in which Capital One did a very good analysis of what the mean and median ranges are, and they're between 20% and 24%. So now we have a case, though, that has a 27.3%, which not only bumps up against the outer limits of reasonableness in a securities fraud case, but goes well beyond what we believe to be the limit of reasonableness, which is 24%. That's why we offered the 6% risk between 20% and 24%. Finally, Your Honor, we believe that the district court erred in not at least considering the Lodestar as a cross-check. Lodestar is not required, we understand that, but given the amount of the settlement and given the application of a percentage that was well beyond what has ever been done in any court, we believe the district court should have at least done a cross-check to the risk premium. And the cross-check would demonstrate that the award, at least at the 56 million level, was a 2.96 multiplier, and that gap further widens if you actually look and drill down on the work that was done. And Florin has said that double the Lodestar is a sensible ceiling. So we think if the district court at least used that as a guide, it would have helped. The district court did not do that. We believe that was an abuse of discretion as well. I'll reserve the rest of my time for rebuttal. Thank you, Your Honors. Certainly, Mr. Romero. Mr. Andrews. Good morning, Your Honor. Ryan Andrews on behalf of plaintiffs Birchmere, Aranda, Parks, and Stone. May it please the court. Judge Cannelli did not abuse his discretion in any of the orders that are at issue in this appeal. The settlement agreement closely follows the best practices laid out by this court in cases such as Redner v. Radio Shack, Pearson v. NBTY, the Pella Windows case, the Footlong Subway case. There is significant cash recovery going to the class members. There's not coupons. There's not meaningless injunctive relief. There's not side prey. Fees are only going to be paid on the amount that's recovered to the class. Nothing is reverting to the defendants. There is a simple one-page claim form. There's no clear sailing agreement. Defendants have and continue to object to the fee. And this case settled after four and a half years of litigation, four days before a jury trial. Judge Cannelli was correct in approving it. Mr. McCabe really isn't even saying the decision should be reversed. Therefore, that decision should be affirmed. The fee order also faithfully applies. Could you talk about the significance of the grant of partial summary judgment to the plaintiff class and how we ought to factor that into consideration of the risk premium? So, information about what happened in the case can be considered so long as it's considered in the context, I think, of an ex-ante negotiation. So yes, that was discussed and some things were discussed mostly in Professor Henderson's expert report. And just like in Silverman, this court looked at an expert report showing that the case lasted four years, that plaintiffs won summary judgment, and only after that win were the defendants really willing to put any money on the table. In Silverman, just like in Professor Henderson's report here, the docket 533-3 to the district court, Professor Henderson only uses that information in the context of a hypothetical ex-ante negotiation. He did, and Judge Kennelly only used that information in the context of a hypothetical ex-ante negotiation. That is exactly what this court did in Silverman, and I think it was completely appropriate to do. Judge Kennelly basically followed everything this court has said to do with the fees. He determined the market rate through a hypothetical ex-ante negotiation. He applied a sliding scale with declining rates of recovery tailored to the realities of this case, and he considered the other district court opinions that my friends have cited, and he explained why this case was different on numerous factors. He noted that this case was riskier. We sued some fly-by-night defendants, not big banks, and there was this political exemption that they known. This was a much more difficult case than all of the bank cases, as I like to call them. They were all basically the same case brought by the same basic entire plaintiff's class action bar. This is not the Volkswagen- I'm not sure you're responding to my question. Are you responding to my question? I think I am, Judge Roper, and perhaps I misunderstand your question. Maybe we could get to the bottom line of the significance of the grant of partial summary judgment. Are you asking whether or not it put pressure on them? It undoubtedly did, but vicarious liability was going to be an issue all the way through trial. We knew this at the beginning. We knew that they didn't place the phone calls like in the bank cases, or there wasn't a agency relationship. Is there anything left of the case if the defendants had prevailed on the question of vicarious liability at trial? No, the case would have been over. The only defendants left were the ones that didn't make the phone calls, and the case would have been over if they prevailed at vicarious liability. The issue set to be tried before Judge Roper's liability question. There was another question related to the landline calls that was still at issue, but the primary focus of all the prep we did for trial was vicarious liability. Okay, well since that's the case in your view, could you spend a moment on the 2013 FCC ruling and what impact that had on the likelihood of the plaintiffs prevailing on the issue of vicarious liability? The defendants seemed to think that that ruling made your past life a lot easier here. First off, that ruling came after we filed this case, so if we're looking at a hypothetical ex-ante negotiation, that would have mattered in the first instance. And while the FCC did state that in TCPA cases that the federal law of vicarious liability, federal common law of vicarious liability, is what applies, there was already kind of some form of that going on anyway. They basically just codified what had normally been happening, and frankly I think they actually may have even made it harder. Prior to that, there were at least district court decisions out there explaining that the language of the on behalf of a call made on behalf of someone was sufficient to not do a full-blown vicarious liability agency ratification apparent authority analysis. So I actually think that order may have made things harder because it clarified the standard. But again, it came after we filed suit in this case and was necessary. How does something that clarifies something make something harder? Could you explain that to me? I love clarification. It doesn't clarify it that much, actually, Judge Rovner. All it basically says is that apply. There was never any issue before that it was solely the company that made the calls that was liable. It was, you know, people for years have been trying to get the other entities involved through either various sorts of agencies or various statutory language arguments. Mr. Andrews, I think you're a master at seeing things both ways within a minute of each other. So which is it harder, easier? Which is it? Clarify, please. I think, I don't, I really don't think the order made a huge difference. It added clarity, but I don't think it made it easier. Is that? I, if Your Honor has no more questions, I will go to Mr. McCabe's appeal. Again, as I noted at the beginning, he's not really asking for the rejection of the settlement. He's only asking for expensive notice. He's not a class member. He needed to, as pursuant to the notice, pursuant to Judge McCabe's order, to be able to make the calls on during the class period. If you read what he wrote, even if it's under oath, he simply does not say that. And this court's recent Kaufman decision that we submitted in our 28-J letter demonstrates that his failure to do that is dispositive on this particular issue. Even granting that, he has absolutely no interest in this case. The two calls that he does identify in the order are two calls that were released by an action he brought in the Eastern District of New York. If he's talking about other calls... What does that have to do with standing? The district judge said that he had no standing, and that rests on a view that any claim subject to the affirmative defense of release should be dismissed because there was never any case. Correct. I believe what Judge Connelly... Has any, has the Supreme Court or this court ever held that the presence of an affirmative defense equates to lack of standing? I do not believe so. The answer is no. The district judge's decision is simply a blunder. Okay. Now, there remains the question whether Mr. McCabe has a complaint about the outcome here, given the affirmative defense of release, but it has nothing to do with standing. This court's decisions look often to whether or not Silverman is an example. The person has an interest remaining in the case, and I'm simply saying that because it is gone, he no longer has an interest in claiming the release is so broad that it covers those calls. I don't think there's any question that those claims are subject to a final order. That is really what I'm saying, and if he was talking about other calls, Kaufman needs to... Kaufman demonstrates that he needed to say that there were other calls, but I think as Judge Roedner noted earlier, everyone in this case, plaintiffs, defendants, Judge Connelly, have all read the release language to mean that it's confined to the calls between August 2011 and August 2012. He points, Mr. McCabe points to the notice, and he says, well, the notice says it's confined to those calls. The notice are part of the agreement. The agreement should be read consistent with the notice and points out what I think is obvious, that the calls are limited to that. I think his argument comes from referencing an earlier complaint that he attempts to create ambiguity from, but the operative amended superseded complaint that's the subject of the language at issue limits it to the calls during that period. There was discussion from my friend, again, that basically the argument that they're making is this court and Judge Connelly could not deviate from what other judges downstairs did in Capital One and the cases that came after it, but they're not really arguing that Judge Connelly abused his discretion so much, is that he has no discretion to deviate from Mechanical One. He had to mechanically apply it. That is essentially their argument as I understand it, but different cases, different facts, different risks, and different results should not be forced into the same approach. Synthroid 2 says this with the 35 percent band. It sets out several hypothetical bands and ranges that the court could have adopted before it set the final standard later. What Judge Connelly couldn't do was ignore those decisions, and he didn't. All he needed to do was look at them, see how they affected the market rate, and explain why this case was different. That's what this court did in Spigen versus the Catholic Bishops case. The courts can't just wholesale ignore those cases, but Judge Connelly spends a fair amount of time in his opinion explaining why this particular case was different. I'm going to touch briefly on the finality of the order question that Judge Easterbrook started with my friends. I don't think there's any question that there's 1292, 1291 jurisdiction, excuse me, on Mr. McCabe's appeal. That was a final order. He's appealing the merits. The court absolutely has jurisdiction on that. I also think that there is, contrary to my friends, I think Judge Connelly's order is final. Judge Connelly set a schedule on the entire fee. He provides a formula that allows for mechanical computation. Now the band of Chippewa Indians versus the state of Wisconsin case says that when there's a formula, and it's this case and this order differs greatly from the last. So why did the judge say, come back to me and ask for more, rather than saying, here's the formula. It will just be applied by the clerk of court. I think he was looking at cases from this court such as Redmond that suggests a two-step approach. He was worried about the fact that defendants were putting funds into the settlement over a two-year period. So the first $56 million is going to be paid out. It hasn't even been put into the fund yet. That payment, I believe, is coming a month or two from now. They still have a whole other year after that. And it's not even a guarantee that they're going to put the $20 million in. We think it's a foregone conclusion that this settlement is going to hit the $76 million. Defendants think their challenges may make some difference. But as for the first $56 million, that's being paid regardless of what happens. And as this court has noted several times, what matters is the ratio between the fee plus the fee plus what class it's getting. And frankly, that isn't going to matter. Redmond suggests doing it in these two stages. And I really think that's just- Suppose a judge says, I'm granting summary judgment to the plaintiff in this tort case. There is liability. And the plaintiff gets at least $1 million representing the cost of medical care. Whether the plaintiff is entitled to pain and suffering damages requires a trial, which I'm now going to hold. Can the defendants immediately appeal from the first $1 million of the damages award? I think the answer is unambiguously no. Because it's not finished yet. That's my problem here. The judge has said 14.7 something is the minimum, but it's may, likely, go up. Come back to me and ask. I think what my friends probably should have said is, what if there is no second application? When were they supposed to appeal? If we never apply, if the $20 million never goes in because they go bankrupt and only the $56 is there, Judge Cannelli's order is unquestionably final at that point in time, I think. If they certainly- So then you have to answer my question the other way. What if the defendant in my hypothetical tort case goes bankrupt between the first order and the trial? You would say that's appealable because the possibility of bankruptcy or the possibility that the plaintiff will then cave in and give up and not want the trial and so on. But your sense, I'm sure entirely correct, was you have to wait for the trial. Of course. But I think that's the case is still going on. I know a long time ago before the Supreme Court clarified this, fee awards that related to a merits decision could also come up. I understand that's no longer the law. But I think this case differs radically from last Friday's decision in Cook versus Jackson National Life where Judge Castillo merely said, motion granted, didn't put a number. Here we have a formula. Here we have maybe three quarters of a number. We're missing the other quarter of the number. I mean, I grant your point. Look, it is obvious that this requires some attention. There's the rule that mechanical awards, if this is indeed mechanical, if everything else is mechanical, that might make it appealable under established doctrine. There are a couple of courts of appeals that have said, if the district judge expressly breaks the fee award into phases, you can appeal each phase. And then there are courts that have said, no, that's wrong. I think that we would indeed benefit from supplemental briefing of the question whether we have appellate jurisdiction with respect to the fee award. So the court will give the parties, all parties, 14 days to file supplemental briefs about appellate jurisdiction concerning the fee award. Okay? All right. Thank you, Your Honor. Unless there are any more questions. Well, was the uncertainty that the judge expressed about the finality come back? Was that more in the nature of if there are factors that warrant reconsideration or something like that, as opposed to if things based on the record now, this is the formula, apply it, this is the fee? My take from what Judge Canelli said at the hearing and from the order is what he wants us to do is tell him how many claims there are when that process is done. That is the only thing that he is going to need to plug it into a formula, and then he will spit out the extra money if there is any. I think the real problem here is the if there is any, which I think makes the order final in the first place. And the time it will take to determine whether the number of claimants is, how long is that, will that take? It is very close to done. We should know pretty soon. I mean, I know the numbers in the record, there are numbers in the record, there are numbers after the record, after the claims process. It should be done soon. Thank you. Thank you. Thank you very much, Mr. Andrews. Mr. Clore, anything further? Briefly, I did not really get to address the order denying our fees. The primary basis for defendants would make the same objections and that we should have just stayed on the sidelines while a defendant advocated our position. And I would just observe that the defendants' interests here are not aligned with those of the class. Class counsel's briefing notes that defendants will lose their incentive to oppose fees when and if the $76 million ceiling is reached, which class counsel represent as a foregone conclusion. So defendants will eventually have no incentive to fight fees on appeal, according to class counsel. And so if we had relied on defendants, we would have done so to our detriment and would be stuck with an award that we believe is excessive. We believe we conveyed a material benefit and that our modest request for a $1,000 incentive award and LODESTAR with no multiplier, which amounts to less than 1% of the benefits, should have been granted. So freedom of home care requests respectfully that the Mr. Romero. Anything further? I just appear to address, I think, Judge Rovner's question about the FCC declaratory ruling, the 2013 declaratory ruling. We do believe that clarified vicarious liability. It provided certain examples of how to get it. It explained apparent authority, ratification, actual agencies, and the like. So we believe it did clarify. Unless there's any other further questions, that's all I have to say. Okay. Thank you very much. We will look forward to receiving jurisdictional memos within 14 days. And when they've been received, the case will be taken under advisement.